## DIXON et al. v. McDONALD.

### No. 3504.

Court of Civil Appeals of Texas. Beaumont.

June 15, 1939.

D. E. O'Fiel, of Beaumont, for appellants.

Combs & Combs, of Beaumont, for appellee.

WALKER, Chief Justice.

Appellant, Fay Dixon, a feme sole, for herself and as next friend of Alden Dixon, a minor, filed this suit in district court of Jefferson County against appellee, C. T. McDonald, for damages for personal injuries which she alleged were sustained by Alden Dixon, on or about July 1, 1938, while he was appellee's patron in a skating rink owned and operated by him in Jefferson County. The appeal was prosecuted from the judgment of the lower court sustaining appellee's plea of privilege to be sued in Titus County.

Appellants would support their venue in Jefferson County on the following propositions:

First. It is contended that appellee "was engaged in business and resided with his family in Jefferson County, Texas," at the time Alden Dixon was injured. The facts are as follows: Appellee was a married man and, with his family, went from town to town for the purpose of operating a skating rink. At the time Alden Dixon was injured, appellee

had been operating a skating rink in Beaumont, Jefferson County, about two months. During that time he and his wife and child lived in an apartment, rented and maintained by him in the City of Beaumont, but at all times his home was in Titus County. He went from his home to different counties simply as a business venture; when in his judgment it would be more profitable to him, he moved his skating rink to a new location. He operated his business in Beaumont as a temporary proposition. Titus County never ceased to be his home in fact. The first contention is denied.

■ The second point is that, under the doctrine of Pearson v. West, 97 Tex. 238, 77 S.W. 944 (see also Bolton v. Alley, Tex.Civ.App., 25 S.W.2d 638), appellee maintained two homes—one in Titus County and the other in Jefferson County. The cited cases are not in point. In Pearson v. West, supra, in fact, two homes were maintained year after year. In the case at bar, appellee maintained only one home, his home in Titus County; his presence in the other counties was only temporary. When he moved to a new location there was no fixed purpose on his part to return. This point is denied.

■ The third point is that Alden Dixon was injured by reason of a "trespass" committed by appellee in Jefferson County. In 33 Tex.Jur. 85, it is said, discussing venue as it is grounded on "trespass", Sec. 9 of Art. 1995, R.C.S., that "trespass" is intended to embrace only actions for "such injuries as result from wrongful acts wilfully and negligently committed, and not those which result from a mere omission to do a duty." Under the authorities cited on this point in Tex.Jur., in order to constitute a "trespass" through negligence the act complained of must have been an affirmation act—a misfeasance rather than a nonfeasance; in other words the facts must show *active* as distinguished from *passive* negligence. On the issue raised by this proposition, Alden Dixon testified, summary taken from appellants' brief:

"My name is Alden Dixon. Mrs. Fay Dixon, the lady who just testified is my mother. I am eighteen years old and I live at 1753 Grand Avenue. My mother and I both live in Jefferson County, Texas. Sometime about July 1, 1938, I sustained an injury, breaking my ankle while skating at the old baseball park skating rink belonging to Mr. McDonald, the man sitting there. The best I remember, this occurred about nine thirty that night. I had gone to the rink about nine o'clock—I had just gotten off from work, and I was with Mr. Smith and Mr. Wilson; they both live here and Mr. Smith is here this morning. I paid an admission fee of a quarter to get into this rink to skate. For that quarter I got the use of the floor and the skates. They had several boys there who put the skates on, and one of them applied the skates for me. Several times while skating the strap came off the skates, and I went back and had them fixed, and I rather thought the straps were kind of worn as they didn't hold very well; they had a buckle like most all of those skates, just have a strap of leather running through an eye. I don't know whether it was a patented buckle or not. While I was there skating they stopped to make an announcement of some kind; I don't remember just what it was exactly. I was back of the rink, talking to some other fellows, when they started again I started on around, and there was a bunch of boys there, and as I went around I ran into a box in front of the skating rink and broke my ankle—a box that had been placed in the skating rink. I had made something like fifteen or twenty rounds, I think, on that rink, on that particular occasion, on that particular night before this happened to me. Before I got hurt I had made the rounds of the rink, and the box that I ran into was not there on those previous occasions. They had suspended skating to make some kind of an announcement, and I had stopped then, and after the announcement was made everyone started skating, and I started out, just started skating from the rear, from the back to the front. I didn't know that box was there, I didn't see it because the lights kind of blinded me a little, and I wasn't expecting a box to be there, and just naturally hit it. I couldn't say just exactly what color the box was, just kind of a dull off color. The floor I was skating on was kind of a natural floor, kind of like maple or something of that type, kind of dull, dark shade the way it was finished. The color of the box and the color of the floor, at that point, was about the same shade or color. They had several strings of light in there. There was a counter in front of the rink where they gave you skates as you paid the admission and came in. They had lights hanging against some boards that sort of reflected, and the lights kind of blinded you when you came up from the

back. They had some lights that hung against the boards, and they reflected out into the skating rink, from the front toward the back, from where I was skating.

"I don't know who put the box out there in the floor for me to run into, but I was skating along until I hit the edge of the box; it was shaped something like a shoe shine box, only larger and longer; as I hit it my ankle snapped and broke. This box was projecting out onto the floor of the rink where I was supposed to skate and it had not been there on previous occasions. I said I hit a box located on the floor of the skating rink, and it was about eight or nine feet from the outer edge of the skating rink. I don't know what the purpose of this box was, but it was built something on the type of a shoe shine box, but it was longer and flatter and heavier. I don't know just how many times I had skated around this rink prior to the time I hit the box, but it was several times, and the box was not on the floor during those times. It was placed there just before the last time I skated around the rink. I don't know who put the box there; I later learned that they were put there when the last session was about to begin, I don't know for what purpose. I heard several people tell me they put them on the floor; I couldn't say for that purpose. The management of the skating rink put them there."

The facts developed by Alden Dixon's testimony constituted a nonfeasance rather than a misfeasance—a passive negligence as distinguished from an active negligence, so the evidence did not raise against appellee the issue of trespass.

The judgment of the lower court should be affirmed and it is accordingly so ordered.

Affirmed.